(35 South. 886.)

No. 14,613.

COLLINS v. H. F. LEWIS & CO., Limited.*

(Nov. 16, 1903.)

INJURY TO EMPLOYÉ—DEFECTIVE MACHINERY.

1. Where an employer can and should provide against a possibility of danger to his employés resulting from defective machinery or appliances, and fails to do so, he is liable for the resulting injury.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Thomas C. W. Ellis, Judge.

Action by Lodoiska Collins, individually and as tutrix, against H. F. Lewis & Co., Limited. Judgment for plaintiff, and defendant appeals. Affirmed.

Hubert M. Ansley, for appellant. Robert John Maloney, for appellee.

MONROE, J. The plaintiff claims damages, on her own account and on behalf of her minor son, for injuries received by him whilst in the employ of the defendant company, and, as she alleges, by reason of its negligence. The defendant denies the charge of negligence, and imputes the injuries received by the minor to his own want of care. The case was tried without a jury, and there was a judgment for plaintiff in the sum of $1,500, from which the defendant has appealed.

The material facts, as we find them from the record, are as follows:

Albert Collins, plaintiff's son, at that time a healthy boy, about 18 years old, was employed in a woodworking establishment, in which defendant manufactures cisterns, doors, sashes, etc., operating for that purpose steam-driven machines of different kinds, including a ripsaw, a cut-off saw, a planer, and a dado (the latter being a machine for cutting grooves across the ends of cistern staves). The boy was working under the immediate supervision of Thurston Knight, whose business it was to take the lumber in the rough, and convert it into staves for cisterns, and suitable pieces for sashes, doors, and blinds; and the duty of the boy was to

*Rehearing denied February 15, 1904.

assist in that work by bringing the material to the machines, receiving it from them, and otherwise, no doubt, doing as he was told. On the 21st of December, 1899, at about 20 minutes to 12 o'clock. the boy met with an accident, as a result of which he was unconscious for about 5 days, had to wear a plaster case upon his head and neck for 41 days, a steel apparatus to support his neck for 4 or 5 months longer, and now suffers from perma-. nent dislocation of the fifth cervical vertebra and complete paralysis of one arm. His statement is that he and Henry Knight, another workman, were engaged in carrying a plank from the rear of the mill to the ripsaw, in the doing of which they passed under the belt by which the saw was operated, and which, as the evidence shows, comes down from the shaft above to the saw at an angle of, perhaps, 45 deg. The witness, referring to Knight, says: "He passed first, and as he passed he dropped the plank, and it was such a jolt to me I couldn't drop the plank. He hallooed, 'Look out!' I turned and looked, and couldn't see anything; and he came back to me, picked up his end of the plank, and then I heard a noise like a shot, and that was all."

From other witnesses, it appears that he fell to the floor, and that his subsequent and present condition has been and is as described above. The boy does not pretend to know anything more about the accident itself than he states in the foregoing excerpt. He, however, alleges in his petition, and testifies, that the ripsaw belt was patched in several places, and had been mended with rivets, and he concludes that it broke in two and struck him. Upon the other hand, the witnesses for the defense, who alone should be capable of throwing light upon the subject, whilst conceding the accident and the resulting condition of the boy, testify, one and all, that they do not know why he suddenly fell to the floor and broke or dislocated his neck, and can form no definite theory upon that subject. They also testify that no belt was broken in the mill that day, and those of them who saw the boy before he had been moved from the spot upon which he fell testify that he was then some 35 feet away from the point at which he places himself, and that he could not there have been struck by the belt of the ripsaw, even if it had broken. The extraordinary character of this testi-

mony will be better appreciated after consideration of a few excerpts therefrom.

Henry Knight, the man with whom the boy states that he was working, testifies that he was not carrying a plank with the boy, but that he had been grooving staves; that the boy had been receiving them from the machine and piling them up; and that, a weight connected with the machine having become detached, he undertook to fix it, but subsequently called his brother Thurston Knight. And he then proceeds:

"We were both standing up while he fixed it, and, when he got through, the boy started to go around towards the front. I saw him drop. I saw him when he dropped. I was behind the machine at the time. Q. Did you see anything hit him? A. No, sir. * * * Q. How close were you, to the boy when he fell? * *: * A. About two and a half feet. * * * (Cross.) Q. What struck the boy so as to cause him to fall? A. I don't know, sir. Q. You were two feet from him, you say. You. must have seen? A. 1 wasn't looking at the time he was struck. Q. Something must have struck him? A. I reckon so. Q. What was it? A. I did not see anything. I wasn't looking at the time he was struck. Q. You were looking in the opposite direction. A. I was looking away from him. Q. You were only two feet from him? A. Yes, sir. Q. And you have no idea what struck him? A. No, sir. Q. You haven't any idea, now? A. No, sir. Q. You have no theory, of your own? A. The belt— He might have got caught in the belt" (referring to the belt of the dado). "Q. Well, describe that. How could he have been hurt that way? A. I don't know. I just have an opinion of it. Q. How? A. I couldn't say what struck him. Q. You don't know? A. No, sir; I don't know. Q. You have no idea of your own? A. No, sir; I don't know what struck him. Q. You were standing within two feet of him? A. About that."

Thurston Knight testifies that he was within four or five feet of the boy when he got hurt, and he does not know and can form no idea of the cause of his injury. John Moran says that he saw the boy "about a minute or so—a few seconds" before the accident, standing at the place where he fell; that he saw him a minute after he fell; and he is asked, "And you have no idea what struck him?" to which he replies, "No, sir." And there are others who give testimony of the same character, and all of them, save one, are unable to remember that any particular theories as to the cause of the action were propounded among the employés. The exception is J. M. Green, who seems to have a proprietary interest in the factory, is one of the foremen, and made an offer of $50 at one time to the mother of the boy. He testifies that he was called a few seconds after the accident happened, and that "he asked if anybody had seen it," and "they said, 'No.'" A little later we find the following:

. "Q. How was he injured? A. I don't know. Q. Have you any idea? A. I heard the belt hurt him. Q. Can you give any idea of anything else that would have hurt him? A. I don't know. Q. Have you got any theory? A. No, sir; I have studied it, but I can't think of anything. Q. Nothing but the belt? A. Nothing but the belt, they claim. Q. Who is 'they'? A. The boys working there. Q. You mean that the people working in the mill have discussed this question? A. Yes, sir; and they can't find any idea, except he was struck by the belt. Q. You have no idea of your own, either? A. No, sir."

This witness further testifies, with dogmatic assurance and without qualification, that a belt, such as the ripsaw belt, 12 or 14 feet long (and, we think, judging from the photographs in the record, considerably longer), running down from the power shaft to the machine at an angle of, say, 45 deg., will necessarily be drawn up to the shaft in the event of its breaking, from which the court is given to understand that in such case the only unsafe place in the neighborhood would be the shaft. He also attempts to create the impression that a person, if struck by such a belt, broken whilst driving the machine at high speed, might be hurt a little, but would not be likely to be much injured. Apart from the testimony to the contrary of an expert engineer who was examined on behalf of the defendant, the absurdity of these statements is manifest. They are not more absurd, however, than the general drift of the testimony of the defendant's witnesses, who, notwithstanding the boy's narrow escape from instant death, and notwithstanding the fact that, as a result of the injuries received by him, he is to-day a

cripple for life, insist that the place at which they pretend to say that he was injured was one of absolute security, where no evil could have befallen him; and one of them (Thurston Knight), after saying that he does not know how he was hurt, propounds the theory that he fell down in a fit, and thus dislocated his neck and paralyzed his arm.

The learned judge of the district court, who heard these witnesses, studied the subject with better results than the witness Green, and reached the conclusion that the boy was struck and knocked senseless by the belt to which he himself attributes his injury.

Without further analysis of the testimony, which is full of discrepancies, it is enough to say that we have reached the same conclusion. If the belt in question did not "break," it became unlaced or unhooked or unriveted— a result which might and should have been anticipated and provided against by the defendant; and, as no such provision was made, the defendant is liable for the injury here complained of.

The judgment appealed from is therefore affirmed at the cost of the defendant.